AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of New York

| | |
|---|---|
| United States of America<br>v.<br>Mahin Mojtahedzadeh, d/o/b xx/xx/1945<br><br>*Defendant(s)* | )<br>)<br>) Case No.<br>) 1: 18-MJ-187 (CFH)<br>)<br>)<br>) |

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
APR 10 2018
AT____O'CLOCK____
Lawrence K. Baerman, Clerk - Albany

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of   March, 2014 - August, 2015   in the county of   Saratoga   in the
  Northern   District of   New York  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. 1705(a), (c);<br>31 C.F.R. Part 560 | Count 1: Conspiracy to Violate the International Emergency Economic Powers Act (IEEPA) and the Iranian Transactions and Sanctions Regulations (ITSR) |

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

HSI Special Agent Michael Koscielniak
Printed name and title

Sworn to before me and signed in my presence.

Date: April 10, 2018

_____
Judge's signature

City and state:   Albany, New York     Hon. Christian F. Hummel, U.S. Magistrate Judge
Printed name and title

**Affidavit in Support of a Criminal Complaint**

I, **Michael Koscielniak**, Special Agent of Homeland Security Investigations (HSI), being duly sworn, depose and state:

1. I make this affidavit in support of an application for a criminal complaint and arrest warrant charging Mahin MOJTAHEDZADEH ("MOJTAHEDZADEH") with the following offense:

    a. conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(a), (c), and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Part 560.

2. There is probable cause to conclude that MOJTAHEDZADEH, between about March, 2014 and about August, 2015, willfully conspired with others known and unknown to export and cause to be exported, directly or indirectly, from the United States to Iran, or the Government of Iran, gas turbine parts, without prior authorization from the United States Department of the Treasury, Office of Foreign Assets Control (OFAC), and to engage in transactions that evade or avoid, or have the purpose of evading or avoiding, any of the prohibitions contained in the ITSR, including prohibitions against the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.

3. I am an HSI Special Agent, and have been since May 2005. I am a graduate of the Criminal Investigator Training Program taught at the Federal Law Enforcement Training Center in Glynco, Georgia. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. In the course of my experience as an HSI agent, I have been involved in the investigation of export

1

control violations, money laundering, drug trafficking, immigration fraud, and other crimes. In addition, I have received significant training in the investigation of export control violations, including but not limited to violations of the Arms Export Control Act, the U.S. Department of State's International Traffic in Arms Regulations, the U.S. Department of Commerce's Export Administration Regulations, and the International Emergency Economic Powers Act. Through my training, education, and experience – which has included: (i) debriefing witnesses concerning violations of federal export laws; (ii) reviewing financial records that reflect structuring of money orders, deposits and withdrawals; (iii) conducting surveillance of individuals engaged in violating federal law; and (iv) executing search warrants on suspect premises – I have become familiar with the manner in which commodities are exported from the United States directly or indirectly to various countries, to avoid both reporting requirements and detection by law enforcement.

4. The information set forth in this affidavit was obtained during the course of this investigation, including through personal observations, my review of federal agency reports, other documents and other evidence, and from information communicated to me by other law enforcement officers. Because this affidavit is submitted for the limited purpose of seeking the issuance of a criminal complaint and arrest warrant, it does not include every fact known to me concerning this investigation.

## Export Laws and Regulations

5. Pursuant to the International Economic Emergency Powers Act (IEEPA), 50 U.S.C. §§ 1701-06, the President of the United States was granted authority to deal with unusual

and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides in pertinent part:

> (a) It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.
>
> ...
>
> (c) A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

6. On March 15, 1995, the President issued Executive Order (E.O.) 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and on that date declared a national emergency to deal with that threat. On May 6, 1995, the President issued E.O. 12959, taking action concerning Iran in addition to that set forth in E.O. 12957. On August 19, 1997, the President issued E.O. 13059, clarifying the actions taken in E.O. 12959 and 12957.

7. To implement the aforementioned Executive Orders, OFAC issued the Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. Part 560. With certain limited exceptions not applicable here, the ITSR prohibit, among other things, the export, re-export, sale, or supply, directly or indirectly, from the United States or by a United States person, wherever located, to Iran or the Government of Iran, or the financing of such export, re-export, sale, or supply, of any goods, technology, or services, without prior authorization from OFAC. These regulations further prohibit any transactions that evade or avoid or have the purpose of evading or avoiding any of the prohibitions contained in the ITSR, including the unauthorized exportation

3

of goods from the United States to a third country if the goods are intended or destined for Iran.

The ITSR impose, among others, the following prohibitions:

> **§ 560.203: Evasions; attempts; causing violations; conspiracies.**
> (a) Any transaction on or after the effective date that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this part is prohibited.
> (b) Any conspiracy formed to violate any of the prohibitions set forth in this part is prohibited.
>
> **§ 560.204 Prohibited exportation, reexportation, sale, or supply of goods, technology, or services to Iran.**
> Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or
> (b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

8. At all times relevant to this Complaint, the President has continued the national emergency with respect to Iran and E.O. 13059, 12959, and 12957. The most recent continuation of this national emergency was on January 13, 2017.

### Details of the Investigation

*The Export of Gas Turbine Parts From the United States to Iran Has Been, and Remains, Prohibited by the Department of the Treasury's Office of Foreign Assets Control (OFAC)*

9. On September 28, 2017, OFAC confirmed to investigators that "[u]nless otherwise authorized, the export of gas turbine parts directly or indirectly from the United States or by a U.S. person to Iran is prohibited pursuant to the Iranian Transactions and Sanctions

4

Regulations, 31 C.F.R. part 560 (the "Regulations"), issued under the authority of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, and other statutes." OFAC has confirmed that neither MOJTAHEDZADEH nor the company ETCO has an OFAC license that would permit either to export to Iran, or has ever applied for such a license.

10. Despite the laws prohibiting the export of gas turbine parts to Iran, various individuals and entities have sought to violate U.S. export laws by using intermediaries to purchase gas turbine parts, from vendors inside of the United States, that ultimately are exported to, and used in, Iran. I know from my training and experience that the demand in Iran is high for quality gas turbine replacement parts that can be used in various General Electric energy turbines. This is because much of Iran's electricity is generated by older model General Electric energy turbines which routinely need replacement parts in order to reliably operate and generate electricity for the citizens of Iran. Because the United States is the source of the most reliable gas turbine replacement parts, and because utility companies in Iran cannot lawfully purchase gas turbine parts from vendors inside of the United States, the Iranian utility companies often seek to purchase said parts through intermediaries as the intermediaries (i) can help conceal the true end users, and (ii) are less likely to arouse the suspicion of U.S. companies or U.S. law enforcement agencies.

## Facts Supporting a Finding of Probable Cause

*Background on Mahin MOJTAHEDZADEH and ETCO FZC*

11. Mahin MOJTAHEDZADEH is approximately 70 years old and is an Iranian citizen who, during the time period between March, 2014 and August, 2015, served as the Managing Director for an Emirati company known as ETCO FZC.

12. According to open source materials, ETCO FZC is based in the RAK Economic Zone[1] of the United Arab Emirates and focuses on the procurement and supply of gas turbine parts and accessories for various customers, to include power generation plants and electric utilities.

13. According to the publicly available portion of MOJTAHEDZADEH's LinkedIn online profile, she is described as the "Managing Director at ETCO FZC" from July 2008 to the present, although upon information and belief, MOJTAHEDZADEH has in recent months stepped down from her Managing Director position.

*The Business Relationships Between Mahin MOJTAHEDZADEH / ETCO FZC, European Company #1, and Company A*

14. "European Company #1" has been based in the European Union for several years and has been owned/controlled by Cooperating Witness #1 (CW#1)[2] for nearly a decade. During this period of time, CW#1 has used his/her European Company #1 to purchase gas turbine parts in the United States for export to end-users / customers located in Iran.

15. Through a 2017 debrief of CW#1, and through European Company #1's records provided by CW#1, investigators have learned that CW#1 / European Company #1 began a

---

[1] In the UAE's RAK Economic Zone, businesses have zero taxation and pay no customs duties on re-exported goods. Moreover, the shipment of goods (to include goods that were obtained in violation of U.S. export laws) from the UAE to Iran is not prohibited by UAE laws.

[2] In 2017, CW#1 was arrested by federal agents and charged in the Northern District of New York with a variety of crimes related to the unlawful export of goods from the United States to Iran. Other than the aforementioned charges, CW#1 does not appear to have any other criminal history. CW#1 has provided information to investigators with the hope that his/her cooperation will be viewed favorably by the USAO NDNY at the time of any sentencing hearing. To date, CW#1's information has proven reliable and investigators are unaware of any instances in which CW#1's information has proven unreliable.

6

business relationship with MOJTAHEDZADEH / ETCO FZC in about June, 2010. The relationship continued until at least August, 2015.

16. According to CW#1 and records from European Company #1, MOJTAHEDZADEH / ETCO FZC was a customer of European Company #1, and in the 2014 timeframe, MOJTAHEDZADEH / ETCO FZC sought to purchase, via European Company #1, over $2.8 million in gas turbine parts from a vendor in the United States known as "Company A."

17. CW#1 has also told investigators that for most of the past ten years, he/she, via European Company #1, purchased from Company A most of the gas turbine parts from the United States which European Company #1 ultimately exported to Iran. CW#1 further told investigators that he/she and European Company #1 were successful in serving as intermediaries for end-users in Iran because Iranian companies, or companies with direct links to Iran, would be unlikely to be able to purchase gas turbine parts directly from Company A due to the existing sanctions.

*Background on Company A*

18. Company A is based in Saratoga County, New York and "Representative A" has worked for Company A for many years. According to both CW#1 and Representative A, Representative A has been the primary person with whom CW#1 has negotiated deals to purchase gas turbine parts from Company A. As such, CW#1 and Representative A are very familiar with one another.

19. Company A exports gas turbine parts all over the world. Company A maintains a user-friendly website that (i) details the gas turbine parts that it sells; (ii) provides contact

information for any customer inquiries or orders; and (iii) touts how Company A can deliver parts in a timely manner anywhere on the globe.[3] These parts are typically replacement parts to be installed in General Electric gas turbines which are often used in power plants for electricity production. In Company A's business dealings with European Company #1, Company A has shipped most of the items it has sold to Germany, and sometimes to other, non-sanctioned countries, but never to Iran. Representative A is generally familiar with ETCO FZC as Representative A believes that ETCO FZC has been an indirect customer of Company A, that is, ETCO FZC has been a customer of European Company #1 who has in turn purchased turbine parts from Company A.

20. According to Representative A, gas turbine parts made outside of the United States are usually of inferior quality as compared to turbine parts manufactured in the United States. Company A is one of only three or four companies within the United States who sell / manufacture quality turbine replacement parts for various General Electric energy turbines. As such, Company A is part of a limited market whose products are highly sought.

---

[3] Given the ease with which a potential customer of Company A could place an order for particularized turbine parts, and have those parts promptly shipped anywhere in the world by Company A, it makes little sense for a legitimate potential customer who needs parts from Company A to go through an intermediary like European Company #1. However, as is shown in this affidavit, a company (like ETCO FZC) whose plan is to obtain turbine parts for end-users in Iran would likely want to use an intermediary like European Company #1 to (i) conceal the ultimate destination for any parts purchased from Company A; and (ii) allay any suspicions of either Company A or U.S. law enforcement agencies.

8

*Mahin MOJTAHEDZADEH / ETCO FZC's Business Relationship with European Company #1 Began in About June, 2010*

21.     E-mails obtained from CW#1 and European Company #1 show that European Company #1 began a relationship with Mahin MOJTAHEDZADEH in about June, 2010. In an e-mail dated June 28, 2010 from CW#1 to MOJTAHEDZADEH, CW#1 wrote in pertinent part:

> Dear Mrs. Mojtahedzadeh,
>
> first of all we like to thank you for the warm welcome today and the fruitful meeting in your offices.
>
> \*\*\*\*
>
> We are excited about to receive your order confirmation for F5[4] capital spare parts as per your requested and discussed and finalized today.
>
> We are looking forward to hearing from you and to increase our successful cooperation.
>
> CW#1

On July 12, 2010, MOJTAHEDZADEH replied to CW#1 via e-mail and wrote in part:

> Dear CW#1,
>
> Thank you for coming to our Co. I *hope* this meeting will become a beginning of a *long term cooperation* between our companies. (emphasis original)
>
> \*\*\*\*
>
> Best regards
> Mahin

And, on August 3, 2010, CW#1 e-mailed MOJTAHEDZADEH and referenced a particular contract and how $400,000.00 in U.S. dollars needed to be transferred to European Company #1 as a down payment for the contract.

---

[4] Upon information and belief, "F5" is a reference to Frame 5 General Electric turbines.

9

22.    In March, 2014, MOJTAHEDZADEH / ETCO FZC placed a "Purchase Order" for various turbine parts with CW#1 and European Company #1. The purchase order was dated March 10, 2014, the buyer was "ETCO FZC," and the ETCO "Contact Person" was "Mahin Mojtahedzadeh". The purchase order came with a "Quotation Ref" of "BU1 PR 378", which upon information and belief, was a way for MOJTAHEDZADEH and CW#1 to distinguish the aforementioned purchase order from other orders placed by MOJTAHEDZADEH / ETCO FZC with CW#1 / European Company #1.

23.    In paragraph #1 of the March 10, 2014 purchase order, the "Description of Goods" was listed as "11 items spare parts . . . [G]as turbine spare parts: [F]arther [sic] technical details exactly as per your above mentioned offer. (BU1 PR 378)." In paragraph #2, the "Total Contract Value (TCV)" was listed as "USD Dollar 2,859,000.00." In paragraph #3, the purchase order set forth the delivery timeline for the 11 different items sought to be purchased by MOJTAHEDZADEH / ETCO FZC, and in particular, items # 1-6 & 8-10 were to be delivered by European Company #1 "4 weeks from date of payment to the Company A[5] account." In paragraph #5, the "Delivery Term" for the items was "CPT Bandar Abbas".[6]

24.    In paragraph #10 of the purchase order, the order set forth how the containers / packages used to ship the 11 items to Bandar Abbas, Iran were to be marked. Notably, the containers / packages were required to bear the following markings "NPSC-124-Part 1"[7] and the

---

[5] Company A is the same company referenced in paragraphs # 18-20 above.

[6] Bandar Abbas is a city within Iran.

[7] As will be shown later in this affidavit, "NPSC" is significant to investigators as it is an abbreviation for the Niroo Pajooh Shargh Co. – an Iranian Oil, Gas, and Power Generation Company.

"Destination" for the containers / packages was "Bandar abbas – Iran". The purchase order concluded with MOJTAHEDZADEH's signature as the "Managing Director" of ETCO FZC.

*Evidence Showing that Mahin MOJTAHEDZADEH Knew That the Requested Turbine Parts Were Coming from Company A, and that Her Efforts Were Designed to Evade U.S. Export Laws*

25. There is probable cause to believe that (i) MOJTAHEDZADEH knew that the products ordered in the March 10, 2014 purchase order were coming from Company A, and (ii) her actions were a deliberate effort to circumvent U.S. export laws.

26. There is probable cause to believe that MOJTAHEDZADEH knew that the items she was ordering were coming from the United States for at least three reasons. First, as described above, in paragraph #3 of the purchase order placed by MOJTAHEDZADEH / ETCO FZC, there is a reference to the fact that nine of the eleven turbine parts ordered are due to be delivered to ETCO FZC four weeks after payment is made "to the Company A account". Second, in an e-mail sent on March 13, 2014 by MOJTAHEDZADEH to CW#1 and his/her associate, MOJTAHEDZADEH asked CW#1 and his/her associate to send various "documents," to include "Company A ACOOUNT [sic] DETAILS". Third, in the same e-mail, MOJTAHEDZADEH wrote "[p]lease arrange for the inspection of the second stage blade [a turbine part referenced in the purchase order] by SGS, the money will be wired to Company A against SGS report (confirmation of the quality and quantity and packing)."[8]

---

[8] SGS is a company with offices in the United States that inspects the condition and weight of goods prior to shipment. I know from my training and experience that it is a common practice for an overseas purchaser of goods from the United States to require a company like SGS to inspect, at the seller's location, the goods being purchased to ensure that the purchaser is in fact getting what he / she is paying for. In this case, investigators believe that MOJTAHEDZADEH, in the e-mail above, was communicating to CW#1 and his/her associate that Company A could be paid once SGS confirmed that the product(s) were of the necessary quality, packaging, etc.

27. For at least two reasons, investigators believe that as of March 2014 MOJTAHEDZADEH knew of U.S. export laws, and that her efforts were designed to avoid these laws. First, it makes little economic sense to purchase turbine parts through an intermediary such as European Company #1 (who will need to be compensated for its efforts) when the same parts could be directly purchased from Company A by ETCO FZC. Second, investigators have obtained additional e-mail communications of MOJTAHEDZADEH which show that she was on notice of U.S. export laws. In a November, 2009 e-mail from MOJTAHEDZADEH to a representative of a U.S. based company specializing in the sale of instrumentation and testing equipment, MOJTAHEDZADEH asked for a price quote and delivery terms for a particular piece of testing equipment. In December, 2009 an export sales manager of this company e-mailed MOJTAHEDZADEH and wrote in part: ". . . we are not allowed to work on this order, because the real enduser is based in Iran . . . we should inform you that there is still a complete trade embargo to Iran for our products (USA origin). Due to that case we are not authorized to cooperate with companies which are dealing with Iran or with companies which are based in Iran." And, in a completely separate e-mail sent on April 12, 2010 by the representative of a vendor who was considering selling General Electric turbine parts to MOJTAHEDZADEH, the vendor wrote: "Dear Madam, I regret that [the company] is barred by US law from dealing with Iranian Companies and as you [sic] web site states that you are located in Tehran they are unable to continue with this."

*CW#1 and European Company #1 Fulfilled the Order for 11 Turbine Parts Placed by MOJTAHEDZADEH / ETCO FZC in March, 2014 by Purchasing the Parts from Company A in the Northern District of New York*

28. CW#1 and European Company #1 have produced to investigators European Company #1's two invoices submitted / addressed to Mahin MOJTAHEDZADEH / ETCO FZC in connection with the March 10, 2014 purchase order. The invoices are dated March 12, 2014, and cumulatively list the 11 items (as well as individual item costs) that were the subject of the purchase order, and that were purchased from Company A. Consistent with the price term of the purchase order, the two invoices (i) cumulatively request a total payment of $2,859,000.00 from ETCO FZC, and (ii) reference that the $2,859,000.00 in total payments due is for turbine parts purchased from Company A.

29. Your affiant believes that the 11 items referenced in the March 10, 2014 purchase order (and similarly referenced in the March 12, 2014 invoices to ETCO FZC) were in fact purchased by European Company #1 from Company A, and that those items were delivered to Iran for eventual use in energy turbines owned, operated, and/or maintained by Iranian company "Niroo Pajooh Shargh Co." or Iranian company "Mah-Taab"

30. My belief is based on the following reasons. First, CW#1 has indicated that he/she and European Company #1 did business for a number of years with MOJTAHEDZADEH and ETCO FZC, that ETCO FZC used European Company #1 as an intermediary to purchase turbine parts from vendors in the United States, and that said parts were destined for end users in Iran. Second, a review of Company A's bank records showed that in calendar years 2014 and 2015, European Company #1 paid Company A over $7.8 million for turbine parts which likely included the $2,859,000.00 worth of turbine parts sought by MOJTAHEDZADEH / ETCO

13

FZC.[9] Third, in August, 2015, a "Commercial Manager" from ETCO FZC e-mailed European Company #1 and asked if European Company #1 could verify with Company A that a particular turbine part (turbine blades) from "order number BU1PO378" could be "install[ed] in the turbine."

31.     Additionally, in some of the e-mail chains described above, there are indications that MOJTAHEDZADEH and ETCO FZC are either a part of, or have existing business relationships with, Iranian companies Niroo Pajooh Shargh Co. and Mah-Taab a/k/a Mahtaab Gostar Company. As noted previously, ETCO FZC's March 10, 2014 purchase order with European Company #1 required that the turbine parts that were being purchased from Company A be packaged in containers that were labelled "NPSC-124-Part 1". Upon information and belief, "NPSC" is an abbreviation for Niroo Pajooh Shargh Co. Additionally, in one March 12, 2014 e-mail from MOJTAHEDZADEH to a representative of European Company #1, MOJTAHEDZADEH wrote:

> Dear representative of European Company #1
>
> Please find below our client[10] e-mail regarding part numbers, please consider the following points and send us your revised pro forma invoice
>
> Best regards
> Mahin Mojtahedzadeh
>
> **Ref No: NPSC 124**
> **Subject: Hot Gas Path parts (10 items) from European Company #1** (emphasis original)

---

[9] At least two of the wires/transfers that European Company #1 sent to Company A's bank account in 2014 contained memos that referenced a contract or purchase order ending in "378" – which investigators believe is a reference to ETCO FZC's order number "BU1PO378".

[10] Upon information and belief, MOJTAHEDZADEH's "client" is the Niroo Pajooh Shargh Co.

The e-mail went on to list the 10 gas turbine parts / items on one of the March 12, 2014 invoices that European Company #1 provided to MOJTAHEDZADEH / ETCO FZC. At the bottom of the aforementioned e-mail was a reference to an individual and the individual's contact information with the "Niroo Pajooh Shargh Co." Additionally, the aforementioned e-mail sent by MOJTAHEDZADEH did not come from her ETCO e-mail account, rather, it came from the e-mail account of "int@mah-taab.com".

32.  Based upon my knowledge of the investigation, as well as open source information, I know that both Niroo Pajooh Shargh Co. and Mah-Taab are Iranian companies involved in the production, distribution and sale of electrical energy. According to Niroo Pajooh Shargh Co.'s website, Niroo Pajooh Shargh was established in 2004 for the purpose of making Iran's industry self sufficient and free from reliance on foreign countries. The company's website further says it specializes in the areas of power plants, oil, gas, and petrochemicals. On Mah-Taab's website, the company advertises itself as "the first private company in Iran . . . in the field of generation, distribution and sale of electrical energy to the domestic market and abroad." Mah-Taab's website also has pictures of various power plants that it owns / operates in the following Iranian cities: Tehran, Ashkezar, Nowshahr, and Sarakhs.

*Neither Mahin MOJTAHEDZADEH or ETCO FZC Possessed OFAC Licenses to Purchase / Export Turbine Parts from the United States to Iran*

33.  U.S. export control laws prohibited the export or re-export of the energy turbine parts referenced in ETCO FZC's March 10, 2014 purchase order to Iran without an OFAC export license. The evidence demonstrates that MOJTAHEDZADEH knowingly and willfully conspired with others, to circumvent U.S. Export regulations by acquiring, via European Company #1, gas turbine parts from Company A located within the United States, for ultimate

15

delivery to customers in Iran, and that neither MOJTAHEDZADEH or ETCO FZC had the necessary OFAC license to do so.

### Request for a Criminal Complaint and Arrest Warrant

34. Based upon my experience, training, and the totality of circumstances in the above information, there is probable cause to believe that between about March, 2014 and about August, 2015, Mahin MOJTAHEDZADEH willfully conspired with others known and unknown to export and cause to be exported, directly or indirectly, from the United States to Iran, or the Government of Iran, gas turbine parts, without prior authorization from the United States Department of the Treasury, Office of Foreign Assets Control (OFAC), and to engage in transactions that evade or avoid, or have the purpose of evading or avoiding, any of the prohibitions contained in the ITSR, including prohibitions against the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Iran.

WHEREFORE, I respectfully request that the Court issue a complaint and corresponding arrest warrant charging Mahin MOJTAHEDZADEH with a violation of the International Emergency Economic Powers Act, 50 U.S.C. § 1705(a), (c), and the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560.

Michael Koscielniak
Special Agent
Homeland Security Investigations

Sworn to before me this
10 day of April, 2018

Hon. Christian F. Hummel
United States Magistrate Judge